586 So.2d 746 (1991)
Deborah Holley ROSE
v.
STATE of Mississippi.
No. 07-KA-59431.
Supreme Court of Mississippi.
August 21, 1991.
*748 David L. Walker, Law Offices of David L. Walker, Batesville, for appellant.
Deirdre McCrory, Sp. Asst. Atty. Gen. and Mike C. Moore, Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., ROBERTSON and McRAE, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Deborah Holley Rose was indicted along with co-defendant Hobie McCullar in May of 1987, for the arson of Rose's home which was located in rural Panola County in the vicinity of the Sardis community. A separate trial was ordered for each defendant, and the State's case against Ms. Rose went to trial in April of 1988. The jury returned a verdict of guilty, and the judge sentenced Ms. Rose to eight years in the Department of Corrections with five years suspended pending good behavior. Now, Ms. Rose appeals to this Court with ten assignments of error which allegedly occurred during the trial of her case.
Ms. Rose's first assignment of error presents a question of first impression for this Court. Specifically, we are asked to decide whether or not the Fourth Amendment to the United States Constitution and Article III, Section 23, of the Mississippi Constitution apply to volunteer firemen who conduct a warrantless search of fire-damaged premises. After careful thought and study, we find no compelling reason to exempt volunteer firefighters from the guidelines and strictures of search and seizure law as governed by the Fourth Amendment of the federal constitution and *749 Article III, Section 23, of our state constitution. Therefore, it follows that during the trial of this case, certain testimony by volunteer firefighters was the product of an unjustified and warrantless search. Hence, we reverse the conviction and sentence of Deborah Holley Rose and remand the same to the Panola County Circuit Court for a new trial consistent with this opinion.

FACTS
On November 14, 1986, at some time near the 12:00 noon hour, a fire erupted in a child's bedroom located on the southwest corner of Ms. Rose's house. Members of the City of Batesville Fire Department and the Sardis Lower Lake Volunteer Fire Department responded to the blaze. Firefighters extinguished the blaze in the child's bedroom by 1:30 p.m. All of the firefighters testified that following this first fire, the child's bedroom suffered heavy damage. However, the fire itself was confined to this one room, and the rest of the house experienced smoke damage only. As part of standard operating procedures designed to prevent reflame of the blaze, the firemen disconnected all gas and electrical service to the house and drenched the structure with six to seven thousand gallons of water. At least two firemen remained on the scene until 6:00 p.m. to 6:30 p.m. to ensure that the blaze would not reignite. Despite these efforts, a second fire[1] broke out near the hour of 11:00 p.m. on the same day. Many of the same firemen returned to the scene that night to battle the second blaze, but their efforts were in vain. This time the house was a total loss, and no walls were left standing.
During the course of a three-day trial, a total of sixteen witnesses testified to various events and circumstances regarding the burning of Ms. Rose's home on the day in question. Physical evidence is not at issue on this appeal. Rather, it is the testimony of certain witnesses who gave damaging testimony of their observations of the fire scene following the first fire. For this reason, our review of the facts will be limited to the testimony which is necessary for our disposition of this case.
Lamar Sanders was a volunteer fireman for the Sardis Lower Lake Fire Department. Mr. Sanders left a pharmacy class at Ole Miss at 12:00 noon on November 14, 1986. As he turned into the driveway of his home near Sardis, he met fireman Bob Willard, who informed him of the fire at Deborah Rose's home. Sanders went to the fire station and arrived on the scene with the first fire truck. Bob Willard arrived on the scene five minutes later with a second fire truck.
Rose's home was a two bedroom house, with two baths, a living room, den, kitchen, and a back utility porch. It was Sanders' opinion that the fire originated in the southwest bedroom known as the child's bedroom. By 1:30 p.m., the fire had been extinguished, but the firemen were unable to ascertain the cause of the blaze. There was nothing obvious in the fire-damaged contents of the room which suggested a possible source for the fire's origination. After the blaze was extinguished, the firemen employed standard procedures and checked for hot spots in others parts of the house. All of the firemen testified that it was routine procedure to check fire-damaged premises for pockets of hot air, sparks that might have travelled with the smoke, or any smoking materials which could act as an amber and reignite the blaze.
It was during this search of the premises when fireman Sanders noticed that the bathroom was bare of the personal items one might normally find in a bathroom. There were no lady's things in the bathroom, "or towels or anything like that." There was no make-up or toothpaste, and the medicine cabinet was empty. According to fireman Sanders, the bathroom door and the medicine cabinet were "standing open," and his observation simply involved a matter of looking inside. Thus, by all accounts given at trial, the observations of the bathroom area were in plain view. The firemen also opened the closet door of the *750 master bedroom and found very few clothes hanging in the closet.
The absence of personal items in the bathroom raised the firemen's curiosity and prompted them to look further. Sanders testified that they opened a chest of drawers in the master bedroom and found that the drawers contained no clothes. Finally, fireman Sanders stated that he did not find any silverware or dishes in the kitchen until he opened the dishwasher door.
Fireman Sanders remained on the scene with fireman Bob Willard until 6:00 p.m. for two reasons. One was to make sure that the fire was completely extinguished. The second reason was that the firemen had notified the sheriff's office of their suspicion of arson, and they waited until a deputy arrived from the sheriff's office to investigate. Mr. Sanders returned to fight the second blaze at the house later that night.
Volunteer fireman Bob Willard received the first call at approximately fifteen or twenty minutes before 1:00 p.m. Willard and Lamar Sanders worked the fire together for the entire afternoon. Mr. Willard's testimony corroborated that of fireman Sanders. The blaze was confined to one room, and it was extinguished within one hour. Mr. Willard stated that they checked the house several times for hot spots and flashbacks.
Essentially, fireman Willard repeated the same testimony which had been previously offered by fireman Sanders. That is, the bathroom was bare of personal items, and a chest of drawers in the master bedroom was empty. Additionally, the closet in the master bedroom contained very few items of clothing.
Fireman Willard testified that it was standard procedure for firefighters to check every room in the house on both the floor and the attic levels. "[W]e have got to find the hot spots in that house and put them out." Consequently, doors have to be opened in order to check out every room for any areas which can potentially reflame. According to Mr. Willard, who was a former fire chief of the local volunteer force, the searches of the house following the first fire were aimed at determining the cause of the fire and discovering flashbacks of heat, fumes and smoke, if any still existed. Fireman Willard was also on the scene later that night battling the second fire.
Troy Darby was the local volunteer fire chief who lived a quarter to half a mile from Ms. Rose's home. On the day of the fire, November 14, 1986, Darby arrived home from his day job at approximately 5:30 p.m. and proceeded on to the scene of the fire. Thus, fireman Darby did not arrive on the scene until at least four hours after the flames had been doused. Fire Chief Darby testified that when he walked through the house with the deputy sheriff late in the day, he observed that the bathroom was empty as well as the chest of drawers and the closet in the master bedroom. Darby also testified that the carpet was completely soaked with water.
Chief Darby described routine procedure in post fire investigations.
We would go in to the house and we would search for hot spots, extinguish these hot spots and then under normal conditions, we stay there for, not an extended period of time but a certain length of time to make sure that it does not catch back up.
Debbie Darby was a private citizen. Her only connection to the volunteer firefighting department was that she was married to fire chief Troy Darby. She was also a neighbor and a former friend to the defendant, Ms. Rose. Debbie Darby accompanied her husband when he went to inspect the house at approximately 5:30 p.m. Ms. Darby entered the house and was present when her husband and the deputy sheriff conducted a walk-through search. According to Ms. Darby, there were no clothes in the drawers, no jewelry in the jewelry box and no medicine in the medicine cabinet. Ms. Darby stated that the defendant owned several nice items of jewelry and clothing, and her closet was normally full of clothes.
Deputy Joe Cosby arrived on the scene at approximately 5:30 p.m. Officer Cosby was responding to a call placed by the *751 volunteer firefighters wherein the volunteers had communicated their suspicions of arson to Panola County sheriff's office. Despite the fact that officer Cosby arrived on the scene to investigate the possible commission of a crime, the officer did not obtain a search warrant. Therefore, the defendant made a pre-trial motion to suppress the anticipated testimony of officer Cosby regarding his observations during his search[2] of the house following the first fire. The learned trial judge wisely granted the motion to suppress, and deputy Cosby's testimony was properly limited to other matters not associated with the warrantless search.

ANALYSIS

I. ARE VOLUNTEER FIREMEN SUBJECT TO THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE III, SECTION 23 OF THE MISSISSIPPI CONSTITUTION?
This issue squarely presents a question of law. Does Fourth Amendment[3] search and seizure law as well as Article III, Section 23 of the Mississippi constitution,[4] extend to the activities of volunteer firemen? The standard of review for questions of law is de novo. Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990); Cole v. National Life Ins. Co., 549 So.2d 1301, 1303 (Miss. 1989); Boggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980).
The Fourth Amendment safeguards the privacy interests of individuals against arbitrary invasion by governmental authorities. Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). The Fourth Amendment does not apply to private individuals. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Lucas v. State, 381 So.2d 140, 144 (Miss. 1980). We begin by noting that a fireman cloaked with governmental authority who is present at fire-damaged premises for the purpose of ascertaining the origin of a fire or looking for evidence of a crime is subject to Fourth Amendment standards. "[T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman... ." Michigan v. Tyler, 436 U.S. 499, 506, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486 (1978).
Are volunteer firemen characteristically "governmental authorities" or private persons not subject to the Fourth Amendment and Article III, Section 23 of the Mississippi constitution? Our venture into this area begins with a clean slate, for very few courts in other jurisdictions have ever considered the question. Appellate courts in Michigan and Missouri have applied Fourth Amendment standards to volunteer firemen who also happened to be "off duty" police officers. See People v. Chapman, 73 Mich. App. 547, 252 N.W.2d 511, 512 (1977) (volunteer fireman who was also police officer seized illegal game discovered while on premises fighting fire); State v. Dawson, 675 S.W.2d 127 (Mo. App. 1984) (volunteer fireman who was also deputy sheriff seized marijuana discovered while on premises to fight fire). Notably, there is one case from a Louisiana appellate court which did, in fact, routinely apply search and seizure constitutional law to a search by volunteer firemen without any *752 inquiry into the private v. governmental distinction of volunteer firefighters. See State v. Burge, 449 So.2d 196-200 (Ct.App. 3d Dist. La. 1984).
The record in this case establishes that the volunteer firefighters receive state sponsored training from the state fire academy. It is common knowledge that rural volunteer associations typically depend upon a local taxing district for their source of financial support. The water trucks and other equipment used in firefighting are obviously not privately owned. In this case, the Batesville Fire Department also responded to the call as well as the local volunteer force. Unquestionably, the salaried, city sponsored firefighters of the City of Batesville are subject to the Fourth Amendment. Michigan v. Clifford, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984); Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). However, no members of the City of Batesville Fire Department testified at trial. In many instances, firefighting activities involve joint ventures between volunteer associations and paid, government sponsored forces, as was the situation in this case. Their experiences, observations and firefighting practices and procedures at the fire scene should be identical. We find no logic in a result wherein the volunteers would have free rein with their search of the premises and collection of evidence while the governmental, paid forces would be restricted under well settled principles of constitutional search and seizure law. In short, we find no compelling reason to exempt volunteer firefighters in Mississippi from the requirements and standards of the Fourth Amendment of the federal constitution and Article III, Section 23 of our state constitution.
Having determined that volunteer firefighters are subject to the Fourth Amendment, we turn now to the specific facts at bar and the applicable constitutional standards governing searches of fire-damaged premises.
Each warrantless, investigatory fire search must be evaluated on a case by case basis. Michigan v. Tyler, 436 U.S. 499, 507, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486 (1978). Absent consent or some recognized exception or exigency for which a warrant is not required, warrantless entries are illegal. Tyler, 436 U.S. at 509, 98 S.Ct. at 1950.
First and foremost, a burning building presents an exigency of compelling gravity making a warrantless entry reasonable. Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978). Once in the building, firefighters may seize evidence of arson which is in plain view. Tyler, 436 U.S. at 509, 98 S.Ct. at 1950. Firefighters are charged with the responsibility of determining a fire's origin in addition to extinguishing the blaze itself. Id. at 510, 98 S.Ct. at 1950. Once inside a building to fight a fire, officials may remain on the premises for a "reasonable time" to investigate the cause of the fire. Id. at 511, 98 S.Ct. at 1951. Prompt action in determining the fire's origin is essential in ensuring there will be no rekindling of the blaze. Therefore, it follows that if a warrantless entry to extinguish a fire and determine its origin is constitutional, then the warrantless seizure of evidence while inspecting the premises for these purposes is likewise constitutional. Id. at 510, 98 S.Ct. at 1950.
Constitutional searches of fire-damaged premises was revisited by the United States Supreme Court in another Michigan case in 1984. In Michigan v. Clifford, 464 U.S. 287, 291, 104 S.Ct. 641, 645, 78 L.Ed.2d 477 (1984), Detroit firefighters suspected arson in a house fire which they battled in the early morning hours. Their suspicion was related to investigators in the arson division of the Detroit Fire Department, and arson investigators arrived on the scene at 1:00 p.m., approximately six hours after all firefighters and police had left the scene. Clifford, 464 U.S. at 290, 104 S.Ct. at 645. The arson investigators entered the house and conducted an extensive warrantless search which included a search of drawers and closets. Id. at 291, 104 S.Ct. at 645. In Clifford, the Court noted that privacy expectations in fire-damaged premises will vary in each case. Id. at 292, 104 *753 S.Ct. at 646. The character and use of the property,[5] the amount of fire damage and the owner's attempt to secure the site should be considered. Id.
Some fire may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations. The test essentially is an objective one: whether "the expectation [is] one that society is prepared to recognize as `reasonable.'" Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
Michigan v. Clifford, 464 U.S. 287, 292, 104 S.Ct. 641, 646, 78 L.Ed.2d 477 (1984).
The aftermath of a fire is itself an exigency which will not, "tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises." Michigan v. Clifford, 464 U.S. 287, 293, 104 S.Ct. 641, 647, 78 L.Ed.2d 477 (1984). "Because determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases." Clifford, 464 U.S. at 293, 104 S.Ct. at 647. The threat that a blaze might rekindle presents an exigency justifying warrantless and nonconsensual postfire investigation. Michigan v. Clifford, 464 U.S. 287, 293 n. 4, 104 S.Ct. 641, 647 n. 4, 78 L.Ed.2d 477 (1984). However, the scope of the search must be limited to its objective. Clifford, 464 U.S. at 294-95, 104 S.Ct. at 647-48. Justification for a warrantless search to determine the cause and origin of a fire and to guard against rekindling ends when the cause is determined and the danger of reflame ceases. Id. at 294, 297, 104 S.Ct. at 647, 648. In other words, such a search cannot "grow" into a fishing expedition or curiosity adventure with its object being the discovery of criminal activity.
We turn to the facts of the case sub judice, and we begin with the testimony of firemen Sanders and Willard. Both Sanders and Willard testified that once the blaze in the child's bedroom was extinguished, they began checking other rooms in the house for hot spots when they noticed that there were no personal items in the bathroom, and the medicine cabinet was empty. The bathroom door and the medicine cabinet were both "standing open." These observations were clearly plain view observations well within legitimate constitutional parameters. If firefighters may seize evidence of arson which they find in plain view, Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978), then certainly testimony of plain view observations would be fair game as well. Likewise, we find that the testimony regarding the closet in the master bedroom passes muster. It will be recalled from the facts that the closet door had to be opened, and the testimony was that the closet contained very few items of clothing. The facts reveal that at this stage of the post-fire investigation, the firemen were checking each room of the house for clues for the cause of the fire, and the firemen were conducting standard operations to ensure that the blaze would not rekindle.[6] The uncontradicted testimony was that it was standard procedure to check each room of the house until the cause of the fire is ascertained. Without *754 question, a prompt cause and origin investigation and reflame operations present exigencies justifying a warrantless postfire search. Michigan v. Clifford, 464 U.S. 287, 293, 104 S.Ct. 641, 646, 78 L.Ed.2d 477 (1984).
However, regarding the testimony concerning the chest of drawers and the contents of the dishwasher, we cross a new barrier. "[T]he scope of the search may be no broader than reasonably necessary to achieve its end. A search to gather evidence of criminal activity not in plain view must be made pursuant to a criminal warrant upon a traditional showing of probable cause." Michigan v. Clifford, 464 U.S. 287, 294-95, 104 S.Ct. 641, 647-48, 78 L.Ed.2d 477 (1984). Here, the legitimate scope of cause and origin and reflame operations had been exceeded. At this point, the purpose of the search had clearly turned into a curiosity adventure which might lead to the discovery of criminal activity. As illustrated by the testimony of fireman Sanders, the legitimate and necessary scope of the search was exceeded when the search was extended to the chest of drawers located in another room.
Q. (By Mrs. Lamar) Anything else that you observed that you thought was unusual about the premises?
A. After seeing no make-up, no toothpaste, or towels or any of that type thing in the bathroom, we kind of started looking around. And at that time we found one of the chest of drawers had no clothes in it... .
Such a search requires a warrant upon a showing of probable cause to an independent judicial officer. Clifford, 464 U.S. at 295, 104 S.Ct. at 648. It follows then that upon remand of this case to the Panola County Circuit Court, testimony regarding the contents, or lack thereof, of the chest of drawers and dishwasher will be excluded.
After the first fire, one bedroom was destroyed and there was smoke and water damage to the rest of the house. The home was not habitable, but personal furnishings remained intact. Therefore, strong privacy interests remained in the dwelling thereby subjecting post fire investigations to warrant requirements. See Michigan v. Clifford, 464 U.S. 287, 295, 104 S.Ct. 641, 648, 78 L.Ed.2d 477 (1984). Fire Chief Troy Darby did not arrive on the scene until approximately 5:30 p.m., some four hours after the fire had been extinguished. By this time, the house had been drenched with water, and firemen Sanders and Willard had made several passes through the house checking for any rekindling of the blaze. The exigency had long since lapsed by the time Fire Chief Darby arrived on the scene, and the reasonable time allowed for investigation of the cause had passed. See Michigan v. Tyler, 436 U.S. 499, 511, 98 S.Ct. 1942, 1951, 56 L.Ed.2d 486 (1978). Hence, just as the trial judge suppressed the testimony of deputy sheriff Cosby's search of the premises following the first fire, the same testimony by Chief Darby should be suppressed on remand of the case to the circuit court.[7]
Debbie Darby falls into yet another category. Debbie Darby accompanied her husband Troy Darby, deputy sheriff Cosby and the other firemen who conducted a search of the premises at approximately 5:30 p.m. on the day in question. Ms. Darby is a private citizen who merely "tagged along" with her husband during his trip to Ms. Rose's house. She was a bystander in the true sense of the word. Debbie Darby testified to observations which were similar to those already offered by firemen Sanders, Willard and Darby, but her testimony was far more damaging than that of the firemen. For Ms. Darby was familiar with the contents of the house prior to the fire. Her testimony presented a comparative observation of the house's contents, before the fire and after.
However, the law in this state is that a private bystander to an illegal *755 search cannot do that which the government is forbidden to do. 1 LaFave, Search and Seizure, § 1.8(b) at 178 (1987). In Mississippi, if a governmental agent is incompetent to testify to the fruits of an illegal search, then so is a disinterested, private bystander who observed the search. Our seminal case is Lancaster v. State, 188 Miss. 374, 195 So. 320 (1940).
While the search was being made, Miss Moore, whose home was only a short distance from the Lancaster home and on an adjoining lot, stood on her premises and saw the search made by the sheriff and the axe drawn out of the well. Over appellant's objection, she was permitted to testify to those facts. We are of the opinion that the court erred in admitting her testimony. It is true that it was not based on any search that she made, but on one made by the sheriff, which was illegal. Her incompetency is upon the same ground as that of the sheriff. To hold otherwise would mean that bystanders off of the premises being illegally searched would be competent to testify to what the search revealed, although the officer making the search would be incompetent.
Lancaster v. State, 188 Miss. 374, 381, 195 So. 320, 321 (1940).
To like effect is Holder v. State, 230 Miss. 792, 93 So.2d 841 (1957).
An officer can not obviate the necessity of obtaining a search warrant before invading the private premises of a citizen, merely by carrying with him other persons who are not officers to make the find. Such would deprive the citizen of the protection provided by the constitution, § 23, against having his premises searched without a search warrant therefor. We do not mean by this that where private citizens are acting alone in searching for their stolen property they are required to have a search warrant.
Holder v. State, 230 Miss. 792, 797-98, 93 So.2d 841, 843 (1957). See Martin v. State, 217 Miss. 506, 510-11, 64 So.2d 629, 630-31 (1953) (bystander rule of Lancaster followed); Cochran v. State, 191 Miss. 273, 276, 2 So.2d 822, 823 (1941) ("[B]ystanders will not be allowed to give in evidence what was revealed by the illegal action of the sheriff."). Compare Lucas v. State, 381 So.2d 140, 144 (Miss. 1980) ("police view" subsequent to search by private person does not constitute "search" within meaning of Fourth Amendment so long as view is confined to scope and product of initial search).
Finally, we note that at the trial of this case, the defendant's attorney objected that the state had failed to comply with a discovery request when the existence of an insurance investigative report was made known to the defendant for the first time. Now that the defense has learned of the report's existence, there should be no problem with its discovery upon remand to the circuit court. However, we pause to inject a strong word of caution as a reminder of the state's obligation to comply with Uniform Criminal Rule of Circuit Court Practice, 4.06. See Barnes v. State, 471 So.2d 1218, 1221 (Miss. 1985).

CONCLUSION
We hold that volunteer firemen in Mississippi are subject to the Fourth Amendment of the United States Constitution and Article III, Section 23 of the Mississippi Constitution. Therefore, it follows that during the trial of this case, certain testimony offered by firemen Sanders, Willard, Darby and Ms. Debbie Darby was "erroneously" allowed into evidence.
Because we find merit in appellant's first assignment of error requiring reversal, we do not consider the remaining assignments of error.
Accordingly, we reverse the conviction of Deborah Holley Rose for the crime of arson and sentence entered by the Panola County Circuit Court on April 30, 1988, and remand the same for a new trial consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS AND McRAE, JJ., concur.
HAWKINS, P.J., dissents by separate written opinion.
*756 HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
The facts of this case are distinguishable from Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), and Michigan v. Clifford, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). The firemen were lawfully on the premises at the time, and there was nothing unreasonable in fireman Sanders opening the bureau drawers and the dishwasher.
The circuit judge properly excluded other evidence resulting from an unreasonable search, and I would affirm.
NOTES
[1] The second fire was described as heavy in the kitchen and master bedroom area.
[2] The testimony indicates that when deputy Cosby arrived on the scene, the firemen led him through the house and pointed out all of the suspicious observations. In addition to deputy Cosby, those present at the time of this walk through search included firemen Lamar Sanders, Bob Willard, Terry Houston, Troy Darby and Debbie Darby.
[3] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const. amend. IV.
[4] Section 23. The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized.

Miss. Const. art. III, § 23.
[5] Privacy interests are strong in a private residence. Michigan v. Clifford, 464 U.S. 287, 296, 104 S.Ct. 641, 648, 78 L.Ed.2d 477 (1984); Payton v. New York, 445 U.S. 573, 589-590, 100 S.Ct. 1371, 1381-1382, 63 L.Ed.2d 639 (1980); United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972).
[6] Nothing in the master bedroom closet was in plain view until the closet door was opened. However, the plain view doctrine in fire search cases must be applied in light of the facts of each case. While searching to find the cause of a fire, firemen must remove debris or search other rooms where the cause of fire might be found. Objects which are discovered pursuant to such a search may be "preserved" without a warrant. Michigan v. Clifford, 464 U.S. 287, 295 n. 6, 104 S.Ct. 641, 647 n. 6, 78 L.Ed.2d 477 (1984).

While on direct examination, fireman Sanders offered some testimony to indicate that the search of the closet was motivated, in part, by reasons of curiosity. However, on cross examination, Sanders stated that the search of the closet was incident to cause and origin and reflame activities. Additionally, fireman Willard indicated that the closet search was part of cause and origin and reflame procedures.
[7] Specifically, the testimony by fireman Darby which should be suppressed on remand of the case for a new trial concerns all of the observations of the house's contents following the first fire. This testimony begins at the bottom of page 168 of the transcript and continues to the bottom of page 170.