609 So.2d 390 (1992)
In the Matter of the ESTATE of Robert TAYLOR, Deceased.
Joyce PERKINS
v.
Lizzie Lee THOMPSON, Booker T. Lee, Thelma Lee Newton, and Western Surety Company.
No. 90-CA-0409.
Supreme Court of Mississippi.
August 26, 1992.
Rehearing Denied December 3, 1992.
*392 Ceola James, Vicksburg, for appellant.
C. Ashley Atkinson, Bert H. Jones, McComb, William Timothy Jones, Calvin L. Wells, Frank T. Moore, Jr., Wells Moore Simmons Firm, Jackson, for appellees.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This is an intestate inheritance contest. The Court below held appellant failed to prove she was the natural daughter of the deceased and did so on grounds appellant's proof did not overcome the presumption of legitimacy arising from the fact that, at appellant's birth, her mother was married to a man other than decedent. This appeal presents principally the question whether there was substantial evidence in the record adequate that this finding must be affirmed.
Appellant also took on an official capacity as administratrix of decedent's estate. She procured and filed an administratrix's bond and, incident thereto, agreed to indemnify the surety for certain legal expenses. The Chancery Court ordered indemnity, and we have before us the question whether the sums covered thereby were reasonably and necessarily incurred in surety in protecting its legitimate interests.

II.
Robert L. Taylor ("Taylor"), died intestate on August 1, 1985 a resident, citizen of Vicksburg, Warren County, Mississippi. Six days later, Joyce Louise Perkins ("Joyce"),[1] a resident of North Carolina, approached the Chancery Court of Warren County and sought appointment as administratrix of Taylor's estate, representing that she was Taylor's sole heir, by reason of her being his daughter, albeit without benefit of Taylor's marriage to her mother at her birth. The Chancery Court entered its order of like date granting the petition and, soon thereafter, Joyce formally qualified as administratrix. Incident thereto, Joyce posted a bond written by Western Surety Company ("Surety") in the penal sum of $200,000.00, a matter of consequence, as will presently appear. Notice to creditors was published in due course, and administratrix began collecting the assets and administering the estate.
At the time of his death, it appears Taylor held assets valued at about $290,000.00, some $186,000.00 of which was in personal property and $157,070.00 of that was cash in a safe deposit box. Taylor also owned real estate valued at approximately $104,000.00. The bulk of the real estate consisted of seven low income rental properties in poor condition, in some of which the decedent had only an undivided interest.
On March 12, 1986, Joyce, as administratrix, obtained an order from the Chancery Court approving her First and Final Accounting, declaring that she was the daughter and sole heir at law of Robert L. Taylor, deceased, and directing that all assets of the estate be distributed to herself in her individual capacity. The distribution included $168,056.30 in cash. The estate was not then finally closed, however, nor the administratrix or surety discharged, as final closing letters from the respective taxing authorities had not been received.
Several months later, Lizzie Lee Thompson, Booker T. Lee and Thelma Lee Newton, the aunts and uncle of Robert L. Taylor, filed a motion to intervene. They denied Joyce's claim to inherit and insisted they were Taylor's heirs at law. On September 10, 1986, the Chancery Court granted the aunts and uncle leave to intervene *393 and rescinded its order declaring Joyce Perkins as sole heir at law of Robert L. Taylor. Substantial, complex and hotly contested litigation thus began and has proceeded apace.
The case now makes its second appearance before this Court. In Perkins v. Thompson, 551 So.2d 204 (Miss. 1989), we resolved a number of preliminary and procedural issues and remanded for trial on the merits. The ultimate issue is whether Joyce Louise Perkins is the natural daughter of Robert L. Taylor, now deceased. If she is, she is his sole heir at law, for it is clear Taylor otherwise died without a surviving spouse or issue. Miss. Code Ann. §§ 91-1-3, -11 and -15 (1972 and Supp. 1991). The source of the controversy is that, at the time of her birth, August 31, 1952, Joyce's mother was married to Ben Perkins, Sr. In opposition to her claim that Taylor was her father, Taylor's aunts and uncle invoked the presumption of legitimacy and have insisted that, in law, Ben Perkins, Sr., was her father, not Robert Taylor. The Chancery Court recognized the presumption and held Joyce had not rebutted it and denied her claim to the estate.
Joyce now appeals.

III.
This appeal demands a sensitive regard for our settled scope of review of a chancery court's decision on issues of fact and credibility. We have repeatedly stated we will examine the record before us and accept that evidence reasonably tending to support the findings made below, along with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact. Williams v. Evans, 547 So.2d 54, 58 (Miss. 1989); Clark v. Myrick, 523 So.2d 79, 81 (Miss. 1988); Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983). The chancery court sitting as the trier of fact has the primary authority and responsibility to assess the credibility of witnesses. Bryan v. Holzer, 589 So.2d 648, 659 (Miss. 1991); Mullins v. Ratcliff, 515 So.2d at 1189; Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963). Where we find substantial evidence in the record supporting the findings of fact, we will seldom reverse, whether those findings be of ultimate fact or of evidentiary fact. Mullins, 515 So.2d at 1189; Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Gilchrist Machine Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986).
Put another way, this Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based on substantial evidence, the court be manifestly wrong. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., ... [525 So.2d 746, 753-54 (Miss. 1987)]; Brown v. Williams, et al., 504 So.2d 1188, 1192 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Will of Polk, 497 So.2d 815, 818 (Miss. 1986).
Mullins, 515 So.2d at 1189.
Still, these standards are general and elusive of precise statement and application, and we have struggled in difficult cases to understand and articulate precisely what is meant. One expression is that "a finding of fact" is "clearly erroneous" when:
although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.
UHS-Qualicare, 525 So.2d at 754; see also, Bryan v. Holzer, 589 So.2d at 659; Estate of Robinson v. Gusta, 540 So.2d 30, 33 (Miss. 1989); Matter of Estate of Varvaris, 528 So.2d 800, 802 (Miss. 1988). Moreover, to the point of credibility, a trial judge has no authority arbitrarily to reject the testimony of a witness otherwise plausible on its face, particularly where that testimony is substantially corroborated. Cf. Heidel v. State, 587 So.2d 835, 839 (Miss. 1991). We are left in the end with guides to judgment and not rules susceptible of mechanical application.

IV.

A.
The law of this state confers upon one such as Joyce Perkins the right to *394 inherit from and through her natural father, even though she was born out of wedlock, provided she proves paternity by clear and convincing evidence. Miss. Code Ann. § 91-1-15(3) (Supp. 1991). Because her mother was married to another at the time of Joyce's birth, Joyce's burden bears a further expression. Our law has long presumed a child born during the course of a marriage to have been fathered by the husband. See Herring v. Goodson, 43 Miss. 392 (1870). We have called the presumption of legitimacy as "one of the strongest known to our law." Karenina By Vronsky v. Presley, 526 So.2d 518, 523 (Miss. 1988); Coleman v. Hudson, 396 So.2d 1024, 1026 (Miss. 1981); Madden v. Madden, 338 So.2d 1000, 1001 (Miss. 1976). The presumption is grounded in the mores and conveniences of our society. We are concerned that children be protected from being "branded as illegitimate." Brabham v. Brabham, 483 So.2d 341, 342 (Miss. 1986); Stone v. Stone, 210 So.2d 672, 674-75 (Miss. 1968). Mothers and fathers are secured as well. Madden v. Madden, 338 So.2d at 1002. More practically, the presumption protects the
substantial state interest in providing for the stability of land titles and in the prompt and definitive determination of the valid ownership of property left by intestate decedents.
Coleman v. Hudson, 396 So.2d at 1026.
Still, "the presumption has bowed to realism," and case after case recognizes it may be rebutted. See, e.g., Karenina By Vronsky v. Presley, 526 So.2d at 523-24. A party challenging legitimacy may prevail if he proves beyond a reasonable doubt that the legal husband of the mother is not, in fact, the biological father. Baker By Williams v. Williams, 503 So.2d 249, 253 (Miss. 1987); Deer v. State Department of Public Welfare, 518 So.2d 649, 652 (1988); Dixon v. Curtis, 340 So.2d 722, 727 (Miss. 1977). The heavy burden  proof beyond a reasonable doubt  is a function of the level of confidence public policy demands in findings of illegitimacy. Cf. Anderson v. Burt, 507 So.2d 32, 38 (Miss. 1987).
The burden notwithstanding, (dis)proving paternity is a matter of fact, and courts proceed as with other issues of fact. Any evidence tending to support or deny the fact may be considered. See Rule 401, Miss. R. Ev. Traditional stratagems have been to offer evidence the husband is incapable of procreation or that he had no access to the wife at times when biology tells the child must have been conceived. Alexander v. Alexander, 465 So.2d 340, 341 (Miss. 1985); Stone v. Stone, 210 So.2d 672, 674 (Miss. 1968); Boone v. State, 211 Miss. 318, 320-21, 51 So.2d 473, 474 (1951). Today we accept that blood tests can "produce a high level of discrimination either excluding or including a given male as the father of a particular child." Baker By Williams v. Williams, 503 So.2d at 253; Deer v. State Department of Public Welfare, 518 So.2d at 650-651; Grimsley v. Tyner, 454 So.2d 482, 484 (Miss. 1984). The Chancery Court was a bit off the mark when it held Joyce had the burden of rebutting the presumption
before the question of whether she was the biological daughter of the decedent, Robert L. Taylor, is reached.
Obviously, proof that she was the biological daughter of Taylor would be substantial proof that she was not the biological daughter of Ben Perkins, Sr., and should be considered in deciding whether the presumption has been rebutted.
The question in the end is whether the court can say beyond a reasonable doubt, given the totality of the circumstances as shown by all of the evidence before it, that the husband is not the father. Necessarily, this standard requires a sensitive assessment of the evidence of each individual case.

B.
The Chancery Court held Joyce had failed in her proof. The Court held Joyce had not shown Ben, Sr.'s lack of procreative capacity, nor had she proved his lack of access to Louise. Beyond this, the Court relied on a long string of documentary exhibits beginning with Joyce's birth certificate and including school records *395 and ultimately Joyce's passport issued in 1973, all of which listed Ben Perkins, Sr., as her father. The question before us is whether the Chancery Court could reasonably have considered these factors adequate that the presumption be sustained. The question requires that we confront Joyce's positive proof.
The evidence that Joyce (a) was the daughter of Robert L. Taylor and (b) was not the daughter of Ben Perkins, Sr., is powerful. We begin with Joyce's mother, Carrie Louise Perkins, who testified unequivocally that she and Ben, Sr., separated in July of 1951, over a year before Joyce was born and that, after their separation, she had not seen Ben, Sr., or had any sexual or physical contact with him. Louise persuasively identifies the date of separation by reference to the birth and age of Ben Perkins, Jr., a child that was born of her marriage to Ben Perkins, Sr. Ben, Jr., was born January 24, 1951. Louise is sure that Ben, Sr., left when Ben, Jr., was about five or six months old.
Ben Perkins, Sr., sixty-three years old at the time of trial, corroborated this testimony. He stated that he and Louise had been married on January 29, 1950, that they lived together a little over a year before separating in July of 1951, and that his only child by Louise was Ben, Jr., who had been born a short while before the separation. Ben, Sr., said he was not Joyce's father, that he had never even known she existed until the January, 1987, hearing in this case, when he was called to testify. He denied any sexual relations or physical contact with Louise Perkins after the separation in July of 1951.
More affirmatively, a couple of months after she separated from Ben, Sr., Louise began seeing Robert Taylor, whom she had met at the Travelers Rest Missionary Baptist Church several years before. Louise and Taylor met and had sexual relations at her home on 420 Depot Street in Vicksburg, even though she knew Taylor was married to someone else at the time. Louise testified that Robert Taylor was the only person with whom she had sexual relations after Ben, Sr., left in July of 1951 and after until Joyce was born.
Robert L. Taylor had married Arutha Evans on August 5, 1942, and, it is true, Taylor remained married to Arutha until her death on November 12, 1961. Notwithstanding, there is substantial evidence that Taylor acknowledged Joyce as his child from the beginning. A critical witness to the point is Howard Stampley, age seventy-nine at the time of the trial. Stampley had known Taylor for years and had worked with him at the Illinois Central Railroad. Stampley lived next door to Louise Perkins when she became pregnant with Joyce. Even before Joyce was born, Taylor would give Stampley money to give to Louise for her support. He said Taylor did this each payday and continued long after Joyce was born. Stampley could not remember exactly when Ben and Louise Perkins separated, but he was certain that, after the separation, he never saw Ben anywhere around the neighborhood.
There is substantial evidence that Robert Taylor all of his life treated Joyce Perkins as his daughter. In addition to providing money for Louise's support during the pregnancy, he continued to visit and support Louise and Joyce regularly after the birth. To be sure, Taylor did not introduce Joyce around town as his daughter so long as Taylor's wife, Arutha, was alive. During this time, Stampley was the principal go-between because "He knew all about it. He knew Robert and he knew me [Louise], and he knew the whole thing."
Over the years after Joyce's birth, Louise became involved with and lived with a man named Willie Shorter and had a number of additional children. Taylor became concerned how this might affect Joyce. After Arutha's death, and while Joyce was in the fifth through seventh grades, Taylor arranged that Joyce live with his mother, Margaret Taylor, and her husband, A.A. Taylor. Taylor did this because he did not want Joyce to have to go so far to school, and because Louise and her children lived in a small house, and Taylor did not want Joyce to have to share the same room with so many other children. *396 It is true Joyce does not remember Taylor before a time when she was about eight or ten years old when he came to her mother's house and Louise had introduced Taylor as her father. Joyce thinks that at this time Arutha was dead. Taylor had a birthday present for her and, after that, he began coming by regularly to see her. He had helped her with clothes and supplies all through her school years. During grade school he bought a piano for her so she could take lessons. He bought her a music encyclopedia set to help her study.
In seventh grade Joyce moved home, because Louise felt guilty and did not like the children being separated. Taylor helped Louise purchase a larger house so that Joyce could move back with her and not have to share a room with all her siblings. The house had been titled in both Taylor's and Louise's names. This did not change Taylor's relationship with Joyce, however, and he still provided her with money, school supplies, clothes, and Christmas presents.
Taylor attended Joyce's high school graduation ceremony, and when Joyce moved on to Tougaloo College on a scholarship, Taylor paid for her clothes, sorority functions, and gave her money to spend. He took her back and forth to Tougaloo on weekends. When she was selected for a trip to West Africa during her junior year of college, Taylor purchased a set of luggage for her and gave her several hundred dollars for expenses. Upon Joyce's graduation from college, Taylor bought her a 1974 Buick Century as a graduation present. Joyce took a job in New York, and, after she got up there, Taylor and a friend drove the car to her. Throughout, Taylor continued to have a great deal of contact with Joyce and sent her Christmas cards and presents.
A number of exhibits confirmed that Robert Taylor treated and considered Joyce his daughter. See, for example: Exh. 70: An undated Christmas card Taylor sent to her. The front says "For a dear daughter at Christmas" and Taylor wrote "Merry Christmas" and signed it "Robert Taylor"; Exh. 72: Another Christmas card from Taylor. The front says, "With love to a dear daughter" and the inside says, "please rember I love you and you can com to me for enything at enytime" [sic] "Your Dad Robert."
Friends and acquaintances in the community testified that Taylor always treated Joyce as his daughter. Thomas John Lincoln, another of Taylor's co-workers at the Illinois Central Railroad, said Taylor told him he had a daughter by Louise Perkins. Taylor once introduced Joyce to Lincoln as his daughter. James Edward Stirgus, Sr., was a teacher and assistant principal at the high school Joyce attended. He knew Robert Taylor well and knew that Taylor had always represented himself as Joyce's father. Stirgus had talked with Taylor many times during the years about how smart his daughter was.
Johnnie Mae Cox, a lifetime friend of Joyce Perkins, confirmed all of this from a different perspective. She and Joyce met in the fifth grade at the time Joyce lived with Taylor's mother, whom Joyce always considered her grandmother. Cox said Robert Taylor had come to his mother's house almost daily visiting Joyce and had referred to her as his "daughter." Joyce called him her "father" or "daddy." Many times Taylor took Joyce to school or picked her up after school if his mother did not. While she and Joyce were attending McIntyre Junior High together, Cox visited at Joyce's house (Margaret's house) several times a week. Taylor was often around and recognized Joyce as his daughter. She still called him "Daddy." When the girls went to high school, Cox remembers Taylor coming to the school and checking on Joyce and talking about any problems she was having. He still represented that Joyce was his daughter and brought her anything she needed.
Taylor and all members of his family, including Joyce, attended Travelers Rest Missionary Baptist Church. There is a custom and protocol in the church that at a funeral the nearest of kin sit on the front row ranked in closeness of kinship. At the funeral of Robert Taylor's mother, Taylor sat on the front row in the front seat as the most immediate next of kin, with Joyce *397 next to him. When Taylor died, this place of honor and recognition was given Joyce. Taylor's funeral program reported, "He leaves to mourn his passing his daughter, Miss Joyce Perkins; granddaughter, Janelle Perkins; stepdaughter, Mrs. Riva Lee Boyden; two aunts, Mrs. Thelma Newton and Mrs. Lizzie Thompson; one uncle, Mr. Booker T. Lee; cousins and friends."
This evidence, and much more in a like vein, is convincing and in and of itself leaves little doubt Joyce was the daughter of Robert L. Taylor and not Ben Perkins, Sr. Candor requires concession there is contrary evidence, though it is of a different and less direct nature, and the question is whether this contrary evidence is such that the Court below may reasonably have found it to raise a reasonable doubt of paternity.
We begin with a series of documents. At the time of Joyce's birth, Louise listed Ben Perkins, Sr., as the father. Ben, Sr.'s name appears on Joyce's birth certificate. Louise concedes this was incorrect but says she used Ben, Sr.'s name because the hospital asked her who her husband was, and she was still legally married to him. Then there are a series of school records. Joyce attended both public and Catholic schools. The records invariably reflect Ben Perkins, Sr., as Joyce's father. Louise furnished Joyce's birth certificate when she first enrolled Joyce in school, and Louise says she thereafter listed Ben as Joyce's father on the school records for consistency. She said she never tried to get the birth certificate corrected because she could not afford an attorney and, in those days, black people simply did not do such things. Joyce acknowledged that the application for her attendance at the Catholic academy, St. Mary's Elementary School, listed Ben Perkins, Sr., as her father, as did the application for her attendance at Bowman Elementary School. These were filled out by her mother.
Sometime during high school, Joyce first saw her birth certificate which showed Ben Perkins, Sr., as her father. She did not ask that her birth certificate be changed. On cross-examination Joyce admitted that she had listed Ben Perkins, Sr., as her father on her application to Tougaloo College, so there would be no discrepancy between her birth certificate and the information she was supplying. She listed Robert Taylor and Margaret Taylor as personal references. Her written statement personal history section began:
I, Joyce Perkins, was born on August 31st, 1952 in Vicksburg, Mississippi to Mr. and Mrs. Ben Perkins, Sr. I spent my early years living in the country with my parents and my two older brothers.
Joyce says she had to write some nice little story in limited space and was concerned about discrepancies between the birth certificate and statements on the application. In reality, the time Joyce spent in the country as a child had been with her mother and Willie Shorter, the man with whom her mother was then living. She did not know who Ben Perkins, Sr., was, and had had no contact with him during her entire life other than when he had testified at one of the hearings in the present case in February.
When she was preparing to take the trip to West Africa during her junior year of college, Joyce filled out a passport application on which she also listed Ben Perkins, Sr., as her father. Again, she had been concerned about consistency between her birth certificate and the passport application. The resulting passport was dated April 18, 1973. When she had been required to apply for a social security number, she once more placed Ben Perkins, Sr., on the application as her father, and for the same reasons. She readily admits that the name of Ben Perkins, Sr., followed her through her academic years on her birth certificate and school and other applications, but she contends she never had any communication from him and never had a relationship of any kind with him. He is not her father.
A final documentary exhibit is the complaint for divorce Louise Perkins filed against Ben, Sr., in 1977 in the Chancery Court of Warren County. The complaint listed the date of separation as July of 1952, instead of July of 1951. Louise and Ben both testified that this was incorrect, *398 and Louise suggests it was a scrivener's error. Significantly, the complaint for divorce disclosed only one child, Ben Perkins, Jr., as having been born of the marriage.
The Chancery Court gave these documentary exhibits substantial credit. We have reviewed them with care. We do not wish to imply that official documents from birth certificates to passports are unimportant, nor should their content and accuracy be taken lightly. On the other hand, the explanation offered by Louise and Joyce is an eminently sensible one, which is completely consistent with the overwhelming evidence of Taylor's paternity and with common experience. Louise's story of the birth certificate is perfectly plausible, and only a lawyer would seriously question that, at each step thereafter, Louise and Joyce quite reasonably thought they had best stick with what was on the birth certificate or fly to evils they knew not of. The circumstances wholly fail to reflect any reason why we should take these documents as impugning the integrity or credibility of these witnesses.
In the end, the Chancery Court credited the documents on grounds the objective facts discredited the witnesses to the contrary. The Court rejected Louise Perkins' testimony, not because her testimony was implausible, was contradicted, or because of her demeanor on the witness stand, but because of "her interest and bias in the outcome of this litigation." The Court declined to accept the testimony of Ben Perkins, Sr., on grounds of "the frail memorials of human memory and his interests."
We are aware of our many admonitions to ourselves and others that we do not look behind a trial court's credibility determination. Still, it is difficult to avoid great reservations about the present findings of "interest." Louise and Ben, Sr., had but the remotest possible pecuniary interests. No doubt, in theory, they could inherit from their daughter, but this seemed particularly unlikely in view of their age and, of course, the fact that Joyce has a child of her own who is certainly her preferred heir. It is rather unrealistic to suggest that Ben has an interest in helping someone who, according to the proof, he had never heard of and did not know existed until called to the hearing in 1987. No doubt, Louise may be charged with an interest in supporting her daughter, but her testimony is nevertheless on its face quite credible and is well corroborated. The presence of an objective interest in the outcome should not, without more, be strong enough to discredit such otherwise perfectly believable testimony.
It is true we have said after long years "the frail memorials of human memory will rarely be accepted to rebut the presumption of legitimacy," Dixon v. Curtis, 340 So.2d at 727, and, though there is wisdom in this view, it does not announce an absolute. We have carefully reviewed the uncontradicted, credible, cross-corroborating testimony of Louise Perkins, Ben Perkins, Sr., and Howard Stampley, and find nothing that suggests the memories of these witnesses particularly frail.
Finally, there is the negative testimony of a number of persons who were kin to or familiar with Robert Taylor who testified in one form or another that he did not tell them Joyce was his daughter, and they were not aware he had a daughter. Some said Taylor had referred to Joyce as his goddaughter. These individuals, without exception, were people who had moved away from Vicksburg and had had only sporadic contact with Taylor and Joyce over the years. Ethelene Harvey gives pause when she says she and Taylor had been lovers over the last nine years of his life, although she never lived with him. She testified that he never told her he had a daughter named Joyce Perkins. When weighed against the affirmative evidence summarized above, this negative testimony creates little doubt.
All things considered, mindful of our limited scope of review, we confront the findings of the Chancery Court, and, when we do so, we are left with the firm and definite conviction that a mistake has been made. Given the totality of the circumstances, we think the evidence shows beyond a reasonable doubt not only that Joyce Perkins was not the natural daughter of Ben Perkins, *399 Sr., but she was in fact the natural daughter of Robert L. Taylor. On this record, we do not see how a trier of the facts could reasonably find other. Joyce Perkins is, on this record, his sole heir at law and by right entitled to his entire estate.

V.
A second substantive issue arises from indemnity agreement Joyce Perkins gave Western Surety Company incident to Surety's writing her administratrix's bond. As a part consideration for this bond undertaking, Joyce agreed to:
completely indemnify the company from and against and liability, loss, cost, attorneys fees and expenses whatsoever which the company shall at any time sustain as surety or by reason of having been surety on this bond or any other bond issued for applicant, or for the enforcement of this agreement. [Emphasis supplied]
Accepting that the aunts and uncle had presented a colorable claim, the Chancery Court, upon allowing intervention, ordered Joyce to return and tender into the registry of the Court $168,000.00 pending further orders of the Court. Substantial questions then existed regarding administratrix's handling of the rental properties. In this setting, the Court appropriately directed that Surety be made a party because of its undertaking on the administratrix's bond.
Incident thereto, Surety engaged separate counsel, Calvin L. Wells, Esq., of Jackson, Mississippi, who proceeded to protect Surety's interests. In due course, Surety filed a cross-claim against Joyce, alleged the indemnity agreement, and demanded reimbursement of all reasonable attorneys fees and legal expenses. See Rule 13(g), Miss.R.Civ.P. At the original hearing, the Chancery Court held that the indemnity agreement was enforceable and found that Surety was entitled to indemnification for $39,155.65 in attorneys fees of and from Joyce. In Perkins I, we affirmed that the indemnity agreement was enforceable but held that it did not represent a blank check which enabled Surety to incur any expense and send the bill to Joyce. We remanded and instructed the Chancery Court to address three issues:
(a) whether it was reasonably necessary for Western Surety to employ separate counsel to protect its interests, (b) whether the surety acted in good faith in incurring those expenses with its principal, and (c) whether the fees and expenses claimed were reasonable in amount.
Perkins I, 551 So.2d at 210.
On remand, the Chancery Court conducted two separate hearings. It appears Joyce was somewhat laggardly in refunding the estate to the point that contempt proceedings ensued. On November 12, 1986, Joyce repaid the estate some $127,000.00. This no doubt eased Surety's pain considerably. The final $41,000.00, however, was not repaid until the eve of trial. Remaining at issue at the time of trial were all other funds of the estate and income from real property, together with $17,000.00 which the aunts and uncle maintained were due from Joyce by reason of her having made improvements to the real property.
The Chancery Court held that Perkins' lead counsel had little experience in surety bond matters and was not in a position to adequately protect Western Surety's interests. "The principal attorney for Joyce Perkins was a solo practitioner, with no office support or staff." The Court recognized that on the date of trial on the merits, Perkins had finally restored the entire $168,000.00 she had previously been ordered to redeposit.
Twenty-twenty hindsight, in view of the fact that the principal paid in all the money ultimately allowed the Estate, does not eradicate the prudence and necessity on the dates these attorneys fees were incurred. Clearly, the surety acted in good faith in all proceedings, and cooperated with the principal, assisting her counsel throughout the preliminaries and the trial.
The Court then recognized that some additional expense was incurred by Western Surety's employing Jackson counsel. There were "several experienced attorneys in Vicksburg [who] could easily have rendered *400 competent services." By reason thereof, the Court sliced over $4,000.00 from Western Surety's fee request and held $35,000.00 a reasonable amount to be awarded. The Court ultimately held Western Surety entitled to recover $35,000.00 "as reasonable and necessary attorneys fees." So far so good.
These findings, insofar as they are findings of fact, are protected by the same substantial evidence rule described in Part III above. But some of the issues tendered for review are not of fact but of law. We must construe the indemnity agreement, a contract, a legal text, if you will, and we approach this matter with an altogether different attitude. Our review is de novo. Watts v. Pennington, 598 So.2d 1308, 1311 (Miss. 1992); Rose v. State, 586 So.2d 746, 751 (Miss. 1991); State of Mississippi v. Aseme, 583 So.2d 955, 957 (Miss. 1991); Harrison County v. City of Gulfport, 557 So.2d 780, 784 (Miss. 1990); Cole v. National Life Insurance Co., 549 So.2d 1301, 1303 (Miss. 1989); UHS-Qualicare v. Gulf Coast Community Hospital, 525 So.2d at 754; Boggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980) This is so whether the law we read be public law of the state or the private law made by agreement.
Against this backdrop, Joyce argues that the expenses incurred by Western Surety were unnecessary and unreasonable and asks that the judgment against her on the indemnity agreement be reversed and rendered. On the question of whether it was reasonably necessary for Western Surety to employ separate counsel to protect its interests, she surely must fail. The Chancery Court had ordered Joyce to restore $168,000.00 to the estate. At the time, Joyce was unable to do this. The Court ordered Western Surety made a party to the case. It is presumptively reasonable that a party sued and served with process should engage counsel and defend. At the time of all of this, Joyce was employed with IBM in North Carolina, earning approximately $35,000.00 a year. She held some IBM stocks and some real property in other states that was encumbered. Without question, Western Surety faced a substantial risk and was justified in employing counsel to protect its interests. Moreover, it is substantially apparent that Joyce's attorney, Ceola James of Vicksburg, Mississippi, was not fully capable of protecting Western Surety's interests. Joyce's personal interests were in tension with her interests as administratrix and with Surety's interests. All of this suggests that Western Surety also acted in good faith in employing counsel and incurring some attorneys fees and legal expenses.
It is important to keep in mind Surety had undertaken only to see that Joyce, as administratrix, properly handled and accounted for Taylor's estate. It appears Surety counsel, nonetheless, became heavily involved in all aspects of the case. The Chancery Court found:
Many preliminary matters, pleadings, motions, depositions, etc. preceded ... [the trial], and constitute a substantial part of the attorneys fees charged... .
Surety is entitled to recover only fees and expenses incurred "by reason of having been surety on this bond." Such fees and expenses and the reasonableness and necessity of same are thus a function of Western Surety's interest in the case and the risks to which it was exposed. Western Surety's undertaking guaranteed that Joyce Perkins would well and truly administer the estate of Robert L. Taylor, that she would collect and account for all assets of the estate, pay all just debts, and ultimately distribute the estate agreeably to the orders of the Chancery Court. Surety interest was in Joyce Perkins in her official capacity as administratrix, not in her individual capacity as a putative heir. Surety had no interest whether the assets ultimately passed to Joyce or to Taylor's aunts and uncle. In this connection, Joyce's trial counsel admits Surety's help on the merits of the case was valuable to them and was of great aid at trial. He also testified that the Surety's counsel never hampered them on the paternity issues but instead was of great assistance. But this is beside the point. Surety had no interest in the paternity issue.
*401 The Chancery Court held that Western Surety's legal fees expenditure reasonable and necessary up to $35,000.00. What concerns us is the Court never assessed the claim in the context of Surety's legitimate interests and the risks to which it was exposed. The Court never came to grips with whether and to what extent the fees and expenses were incurred "by reason of having been surety on this bond." The agreement by its terms limits Surety's indemnity rights to those attorneys fees and legal expenses reasonably and necessarily incurred in protecting Surety's interests. Surety is not, however, under the agreement before us entitled to fees and expenses for helping out on the paternity issue and other matters personal to Joyce, no matter how beneficial that help may have been. The mere fact that Surety's counsel may have been helpful in resisting the paternity issues does not mean that at the time Surety had substantial exposure, thereby needing protection.
The Chancery Court failed to read discriminately the language of the indemnity agreement. Its findings of fact are in effect the product of an erroneous reading of the law. As such, they are not entitled to the protection of the substantial evidence rule. Cf. Ryals v. Pigott, 580 So.2d 1140, 1148, n. 15 (Miss. 1990); Stevenson v. Stevenson, 579 So.2d 550, 553 (Miss. 1991); McClendon v. State, 539 So.2d 1375, 1377 (Miss. 1989). We vacate the judgment below insofar as it orders that Joyce indemnify Surety for $35,000.00. We remand to the Chancery Court and direct that Court to conduct such further proceedings as may be appropriate and, in the end, order that Joyce indemnify Surety only to the extent its interests were at risk, plus fees and expenses reasonably and necessarily incurred for the enforcement of this agreement.
ON APPEAL BY JOYCE PERKINS AGAINST LIZZIE LEE THOMPSON, BOOKER T. LEE, AND THELMA LEE NEWTON, REVERSED AND RENDERED.
ON APPEAL BY JOYCE PERKINS AGAINST WESTERN SURETY COMPANY, VACATED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion.
DAN M. LEE, Presiding Justice, dissenting:
Because our standard of review as applied to findings of a chancellor are:
This Court will not disturb those findings unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Hill v. Southeastern Floor Covering Company, 596 So.2d 874 (Miss. 1992). Reversal is permitted only in those cases where the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion. Powers v. Powers, 568 So.2d 255, 257-58 (Miss. 1990). Where the factual findings of the chancellor are supported by substantial credible evidence, they are insulated from disturbance on appellate review. Jones v. Jones, 532 So.2d 574, 581 (Miss. 1988) quoting Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985).
McAdory v. McAdory, 608 So.2d 695 (Miss. 1992).
Because I firmly believe the majority has radically encroached upon that standard of review in this case, I respectfully dissent.
NOTES
[1] Because there are at least four Perkinses who must be mentioned in this opinion  Joyce, Louise, Ben, Sr., and Ben, Jr., we refer to each by first name to facilitate reading.