724 So.2d 988 (1998)
FIRST SOUTHWEST CORPORATION, Appellant,
v.
Dudley F. LAMPTON, Appellee.
No. 97-CA-00802 COA.
Court of Appeals of Mississippi.
December 18, 1998.
*989 Dennis L. Horn, Shirley Payne, Jackson, Attorneys for Appellant.
Edward E. Patten, Jr., Jackson, Attorney for Appellee.
BEFORE THOMAS, P.J., DIAZ, AND SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. First Southwest Corporation debentures were issued to Dudley F. Lampton in 1987. In 1993 Lampton wanted to exchange them for stock, but he had recently lost the debentures. When Lampton was unable to secure the indemnity bond required by statute for the replacement of lost securities, he successfully requested the chancery court to order the exchange without a bond.
¶ 2. First Southwest raises fourteen issues on appeal which concern the proper procedure for reissue of lost securities and whether those requirements were waived. We do not address every issue, as we reverse and enter judgment here because there was never a waiver of the requirement of physical delivery of the lost debentures prior to exchanging them for stock, and Lampton failed to provide the indemnity bond necessary for issuance of replacement debentures. Lampton was completely within his procedural rights to seek chancery court review of the bond requirements imposed by First Southwest. However, the proper limit to the chancellor's review was whether the corporation was insisting upon unreasonable terms, either in the amount of the bond or in other details. That was never shown, and the obligation to provide the bond remained intact.

FACTS
¶ 3. Lampton was the registered owner of $137,640 worth of debentures issued by First Southwest. Each had a face value of $30, paid 15 % interest, and matured December 31, 1994. On May 12, 1993, First Southwest offered to exchange corporate stock for debentures at a four to one exchange ratio. Lampton under this formula would be entitled to about 18,000 shares. The deadline to accept the offer was June 30, 1993, later extended until July 9, 1993. Lampton executed and returned the subscription agreement on July 8, 1993.
¶ 4. These debentures and some stock owned by Lampton were subject to a lien held by Hancock Bank. Lampton was behind in his monthly payments and received notice from Hancock on May 28, 1993, that unless the loan was brought current or other satisfactory arrangements were made, it would liquidate the assets securing the loan. Thus simultaneously with Lampton's effort to take advantage of the corporation's offer, he also had to negotiate with Hancock to get the debentures released from the bank's lien. A settlement agreement was eventually reached whereby Hancock would release the debentures and stock in exchange for $66,000. The debentures had been in Hancock's possession. On about July 22, 1993, Hancock sent them to Lampton's attorney, Ron Smith, to deliver to Lampton upon payment of the $66,000. The payment was not made. On August 31, 1993, Smith notified First Southwest that he had lost the debentures.
¶ 5. First Southwest refused to exchange the lost debentures for corporate stock until there was physical delivery of the debentures. That meant Lampton and Smith had either to find the debentures or comply with a provision of the Uniform Commercial Code and obtain a sufficient indemnity bond to protect Southwest from claims of bona fide purchasers. Miss.Code Ann. § 75-8-405 (Rev.1981). Once the indemnity bond was presented, First Southwest could reissue the debentures and proceed with the exchange. First Southwest insisted upon a $150,000 third-party indemnity bond. Though Lampton and Smith apparently could afford the premium, they did not have the net worth to qualify for the bond. The deadline for exchange was extended a second time to November 13, 1993. Because of the present suit, the corporation made one last extension to December 31, 1993, in an effort to settle. That day came and went without a bond being presented, the debentures being discovered, or the subscription agreement being formally rejected.
*990 ¶ 6. On November 10, 1993, just before the November 13 deadline, Lampton filed suit in the Chancery Court of Pike County seeking an order directing First Southwest to reissue the debentures without bond, to authorize the conversion of the debentures into stock, and to have the stock deposited into the registry of the court. First Southwest responded by claiming that Lampton was required to post an indemnity bond "at least equal to the value of the stock issued" in exchange for the debentures.[1]
¶ 7. In April 1994, Lampton amended his complaint. In addition to the exchange of debentures for stock, Lampton sought past due interest on the debentures. He also claimed that First Southwest's indebtedness to him was the cause of his default on his Hancock loan. The chancellor on August 22, 1994, granted Lampton's motion for partial summary judgment, finding that $61,938 in interest due on the debentures must be paid. Since Lampton's exercise of any rights under the missing debentures potentially could subject First Southwest to damages if a bona fide purchaser surfaced, the court ordered Lampton to obtain an indemnity bond in the amount of $77,422.50. That represented 125% of the total interest due. Lampton complied with this order by executing a bond along with his brother Dunn, both of whom executed the bond as joint attorneys-in-fact for their mother. The interest was then paid.[2]
¶ 8. On September 7, 1994, the chancellor ordered First Southwest to reissue the debentures once Lampton deposited $35,000 in stocks and/or certificates of deposit into the registry of the court. Lampton complied. First Southwest prepared replacement debentures but never executed them.
¶ 9. Following hearings held on October 4, 1996, and on April 1, 1997, the chancellor entered his findings of fact and conclusions of law. He found that physical delivery of the debentures was not a condition precedent to acceptance of the subscription agreement by First Southwest. Even if it were, First Southwest had waived any such requirement by its acts subsequent to the execution of the original documents. The chancellor also held that section 75-8-405 was not the exclusive remedy for replacement of lost securities. First Southwest was ordered to reissue the debentures.
¶ 10. The chancellor said that there was "no real need for bond" since he did not find it likely that the lost debentures would ever reappear. Even so, he required a bond to reimburse costs to First Southwest "if someone were to come forward and claim possession of the original certificates." The bond that had been executed by Dudley Lampton and his brother on September 7, 1994, as attorneys-in-fact for their mother, was ordered "continued." That bond had secured the payment of past-due interest in the amount of $61,938. The clerk of court was also authorized to sell a sufficient amount of the $35,000 in stock to cover all costs and attorney's fees incurred by First Southwest should a bona fide purchaser of the lost debentures come forward.
¶ 11. The chancellor further ordered that First Southwest convert the reissued debentures to corporate stock in accordance with the conversion ratio set in the offering circular. Additionally, he required that First Southwest pay Lampton all stock dividends due and unpaid. It is from this order that First Southwest appeals.

DISCUSSION
¶ 12. Though individual issues are critical to our review of the chancellor's decision, the overall focus should not be lost. This is a *991 contract case. The central question is whether a contract was ever formed. First Southwest sent an offerthe proposal to exchange debentures for stock. Included in the offer were certain terms, including a date to respond and requirements that unencumbered debentures be exchanged for the stock. Lampton argues that a valid acceptance occurred and a contract was entered despite the problems of the missing, encumbered debentures. Whether that is true is ultimately what we must resolve. The rest is secondary.
¶ 13. To the extent factual issues are relevant, this Court will accept the chancellor's findings provided the evidence in the record reasonably supports them. Matter of Estate of Taylor, 609 So.2d 390, 393 (Miss. 1992). In other words, we will not disturb the findings unless based on a review of the evidence the findings are clearly erroneous or an erroneous legal standard was applied. Hill v. Southeastern Floor Covering Co., 596 So.2d 874, 877 (Miss.1992).
¶ 14. At least two critical problems faced Dudley Lampton when the offer was made to exchange unencumbered debentures for stock. First was that he did not have the debentures. Secondly, they were encumbered by a lien of the Hancock Bank. The chancellor found that neither the absence nor the encumbrance of the debentures was fatal to Lampton's right to participate in the exchange. We proceed to examine that conclusion.

I. Sufficient indemnity bond to replace lost securities
¶ 15. In addressing the first problem, we must decide whether First Southwest's insistence on an indemnity bond prior to replacing the lost securities was proper. We then must consider the argument that even if a bond is normally required, First Southwest waived the requirement of delivering the actual debentures prior to the exchange and therefore the bond question is academic.

a. UCC provision for bond
¶ 16. The chancellor found that the relevant Uniform Commercial Code provision adopted in this State for replacing lost securities was not the sole means of procuring reissue of the debentures. The statutory language is this:
If the owner of a certificated security, whether in registered or bearer form, claims that the certificate has been lost, destroyed, or wrongfully taken, the issuer shall issue a new certificate if the owner:
(1) so requests before the issuer has notice that the certificate has been acquired by a protected purchaser;
(2) files with the issuer a sufficient indemnity bond; and
(3) satisfies other reasonable requirements imposed by the issuer.
Miss.Code Ann. § 75-8-405 (Rev. 1981). The statute was amended in 1996, but the foregoing is the provision in effect in 1993. 1996 Miss. Laws ch. 468, § 39.
¶ 17. Examining the literal language first, we find that the "issuer shall" provide new securities to replace the lost ones if a "sufficient indemnity bond" is presented and if any other reasonable requirements are met. First Southwest imposed no requirements other than the providing of an adequate indemnity bond. Lampton attempted to acquire such a bond, but did not qualify with the commercial bond companies that he contacted.
¶ 18. The record indicates that in addition to paying a premium, the recipient of an indemnity bond must also prove to the surety company that he has adequate assets to permit recovery of some portion of the loss if the bond is ever called upon. By statute, a surety may seek reimbursement from the principal after payment on a bond:
When any surety or guaranty company has executed any bond or other contract as surety for any person ... guaranteeing the performance of any duty or the payment of any money, and such person ... make default therein and said surety or guaranty company pays the amount for which the person insured or guaranteed is legally liable, the said surety or guaranty company becomes thereby subrogated to all the rights of the party in whose favor the security or guaranty is given, and such *992 company may have and maintain an action against the principal....
Miss.Code Ann. § 87-5-5 (Rev.1991). Only if the surety company may first examine whether the person seeking a bond has adequate assets, will the later right of subrogation be creditable. Lampton does not allege that anything other than normal commercial practices prevented his securing an indemnity bond. He went to court because of the problems that he encountered.

b. Propriety of a substitute for bond
¶ 19. The chancellor found that an issuer of securities must accept a substitute for the indemnity bond, but never found or even had raised as an issue that First Southwest in any manner was preventing his securing a bond. Indeed, for several months after Lampton made First Southwest aware that he no longer had the debentures, the corporation worked with him to secure a bond. It is that activity that later is termed a waiver by the chancellor, but we will discuss that issue after addressing the necessity for a bond absent a waiver.
¶ 20. The chancellor in 1996 found that there was no need for a bond, since by that time he believed that there was no possibility that the missing debentures would ever surface. Nonetheless, he required that the bond that he had ordered in September of 1994 be "continued." That was a $77,000 bond executed by Lampton and his brother as attorneys-in-fact for their mother. By its terms it assured the payment of $61,000 in interest due on the debentures. If it were, in 1996, to become a surety bond for the exchange of those securities, then the chancellor needed to have an amendment or a new bond executed. Even so, the 1994 bond language taken together with the 1996 decree language may have created a sufficient obligation that the bond executed on behalf of the senior Mrs. Lampton could have been called upon by First Southwest.
¶ 21. In addition, in 1996 the chancellor ordered that Lampton deposit $35,000 in stocks and/or certificates of deposit with First Southwest in order to indemnify it against any potential bona fide purchasers who might come forward. He further authorized the clerk to sell any of the stocks in order to compensate First Southwest for any losses.
¶ 22. After the final 1996 decree, therefore, First Southwest had a $77,000 bond, written for another purpose, but that may have been usable as a surety bond for issuing new debentures. It also had the right to call upon the chancery clerk to sell $35,000 in stocks to cover its losses. There is a factual issue inherent in this 1996 decree: does that combination of security create sufficient monetary protection for First Southwest? There is a more significant legal issue: is this court-ordered substitute for what the UCC requires permitted? In other words, is section 75-8-405 the exclusive means of obtaining reissue of securities or may a court order a corporation to accept an alternative?
¶ 23. This provision has not often been interpreted, but there is one precedent from our federal circuit that is quite instructive. Glaser v. Texon Energy Corp., 702 F.2d 569 (5th Cir.1983). There the court was concerned with whether a demand made by the corporation prior to issuing replacement stock fell within the "other reasonable requirements" language under Texas's identically worded statute. Id. at 570. That stockholder had provided a bond but never satisfied the corporation regarding other information. The Fifth Circuit found that a court could not order a corporation to issue replacement shares if the stockholder failed to comply with UCC section 8-405, which is our section 75-8-405. The court rejected the argument that compliance with the section was only one means to replace a lost certificate. Under the statute "the court may compel a recalcitrant issuer to take action," but "[s]ince the statute compels the issuer to issue the certificate only if the shareholder has satisfied the statutory requirements, an issuer presumably may not be compelled to issue a certificate where a shareholder has failed to follow the statutory procedure." Id.
¶ 24. We find this to be the correct reading of the statute in part because of the definiteness to commercial transactions that the UCC is intended to bring:

*993 Underlying purposes and policies of the code are
(a) to simplify, clarify and modernize the law governing commercial transactions;
(b) to permit the continued expansion of commercial practices ...;
(c) to make uniform the law among the various jurisdictions.
Miss.Code Ann. § 75-1-102(2). Lampton wished that the chancellor negate the requirements of the UCC because of the difficulty that he was facing in acquiring a bond. Three years after the commercial need for the debentures first arose in 1993, the chancellor in 1996 declared what the alternative procedure to follow would be. The need is frequent for litigation to determine both the meaning of the Code and how to apply it to specific situations, but here the litigation was on whether the Code provisions should be ignored because of one party's difficulty with them.
¶ 25. The Code provisions become part of contracts as fully as if written into the parties' documents themselves. Thus this litigation at its most basic was an effort to write out of the agreements that signified Lampton's purchase of securities the provision for replacing lost securities. Having found that the statutory provision is the sole means to pursue replacement, we necessarily find that the chancellor erred in concluding otherwise.

c. Amount of bond
¶ 26. Though we reject the chancellor's legal conclusion that a bond was not necessary, it is still a valid issue whether the bond that is required is too large or otherwise unreasonable. Thus when Lampton commenced this suit on November 10, 1993, when the deadline was three days away for exchange (later extended to December 31), an immediate hearing on whether the bond was unreasonable in some respect would have been appropriate. From the beginning, though, Lampton asked the court to order First Southwest to reissue the debentures without a bond. The chancellor did ultimately address the necessary bond amount, and we will consider the reasonableness of First Southwest's position regarding the specifics of the bond.
¶ 27. One treatise writer concluded that "[d]ifficult questions arise as to the meaning of a `sufficient indemnity bond.' No precise rule has been stated because of the different kinds of securities that may be involved, with the consequence that there is a variety of losses that might be sustained by the issuer." RONALD A. ANDERSON, UNIFORM COMMERCIAL CODE § 8-405:14 (3rd ed.1996). "Where a nonconvertible debt security is involved, the problem of sufficiency is relatively simple. The issuer's maximum exposure is limited by the sum of principal, accrued interest, and concomitant expenses. Therefore, in practice the bond given calls for a fixed penalty, which is generally not more than twice principal and accrued interest of the security on the date of delivery of the bond." EGON GUTTMAN, MODERN SECURITIES TRANSFERS, ¶ 18.02[8][a] (3rd ed.1987).
¶ 28. The bond should be sufficient to "indemnif[y] against any liability or expense, including attorney fees, to which [the corporation] may be subjected by reason of the reappearance of the original securities." GUTTMAN, at ¶ 15.04[3][b]. The face value of Lampton's debentures was $137,640. The security ordered by the chancellor was the deposit of stocks worth $40,000 to $50,000 into the registry of court. There was never a finding that a bond in the amount of $150,000 to secure the reissue of $137,000 worth of debentures was unreasonable. Had a bona fide purchaser for value appeared with the debentures after their reissuance to Lampton, the corporation's loss would have been the face value and incidental costs. The chancellor in August 1994 found that a bond in the amount of 125% of the interest due on the debentures should be presented by Lampton prior to the interest being paid. The basis of the risk was the same in August 1994 as it was when First Southwest was insisting in late 1993 on a bond worth 110% of the value of the debentures, namely that a bona fide purchaser would be able to claim ownership. Considering the purpose of the bond, we find the amount insisted upon by First Southwest was reasonable.
¶ 29. Moreover, the reasonableness of the amount is to be judged at the time that First *994 Southwest was insisting upon it in 1993. This case is only partly about the replacement of lost securities, which raises the point made at the beginning of this opinion. The chancellor in 1996 not only found that no bond was necessary in order for Lampton to receive new debentures, the chancellor also found Lampton to be entitled to exchange the debentures in what was otherwise a closed 1993 offering. That 1993 offer would create a binding contract only if certain conditions were metexchange of unencumbered debentures by a date certainand then only if First Southwest agreed to accept what was tendered. The initial offering documents gave notice of First Southwest's right to reject any tendered debentures in its sole discretion.
¶ 30. Part of the reason for the need to have this discretion was explained in the trial court. An accountant testified for Lampton as to the tax consequences of permitting a late exchange of debentures for stock. Only a timely exchange as part of a corporate recapitalization plan was tax exempt. The accountant stated that only Lampton would suffer a taxable event by the late exchange, but other consequences were explored on cross-examination. Among the acknowledged problems was that since the debentures were being exchanged for stock, there was a possibility that too much stock would be exchanged if every debenture holder participated in the plan. This would lead to stock dilution caused by an issuing of shares in excess of the authorized number. Miss. Code Ann. § 79-4-6.01 (Rev.1996); Glaser, 702 F.2d at 572. The April 1993 minutes of First Southwest's board meeting that authorized the exchange indicated that there were sufficient unissued shares to permit all debentures to be exchanged. The corporation had ended the recapitalization in 1993 after having made the number of exchanges that in its discretion were desirable financially and permissible otherwise. The effect of more stock being issued for Lampton's debentures was unclear but does indicate the reasonableness of a definite ending-date for exchanges.
¶ 31. Now that we have found that a corporation is entitled to insist upon a bond, and before determining whether First Southwest waived that requirement, we examine whether a bond was actually provided. We find that the deposit of $35,000 in stocks into the registry of court is not a bond, as contemplated by the statute, anymore than would be any other security that a court might find was financially equivalent to a bond. We have already held that the statute permits the corporation to insist upon an indemnity bond. The factual inquiries necessary to determine whether a stockholder's personal assets, his other stock, or even real property were adequate to protect a corporation from bona fide purchasers just are not permitted under the Code.
¶ 32. Although the chancellor held that he "saw no real need for bond," he "set a bond to simply insure that any costs that might be incurred by First Southwest would be covered...." The $77,000 bond by Mrs. Lampton that secured the payment of interest is the only bond ever provided. Section 75-8-405 calls for an "indemnity bond." Although this term is not defined by the U.C.C., it is recognized that in order for the indemnity bond to be proper, "[it] should be executed by the owner of the stock, as principal, and by a recognized surety or indemnity company, as surety. Most corporations have a list of such companies which are satisfactory to them ...." FRANCIS T. CHRISTY AND ROBERT S. APPEL, THE TRANSFER OF STOCK § 277 (5th ed.1975).
¶ 33. As a substitute for this commercial bond, the chancellor became the underwriter for the transaction. He ordered a private bond and other security as he thought adequate to be placed into the registry of the court. Courts at times are called upon to perform this sort of task, but what initiates the need is one party's unreasonable interpretation of what the Code requires. That did not occur here. We need not decide whether the nature of the bondone executed by the plaintiff and his brother as attorneys-in-fact for their motherwas inadequate compliance with the statute. The authority just quoted would declare that it was not. We only hold that First Southwest's insistence upon a $150,000 bond was *995 commercially reasonable. Such a bond was never provided.

II. Waiver of physical delivery
¶ 34. Though we have found that First Southwest had the right to insist on an indemnity bond, and one was never provided, the chancellor also determined that the corporation's conduct waived the requirement that the debentures be physically tendered. That conduct primarily consisted of ongoing communications between the parties regarding the missing debentures without a specific rejection of Lampton's request to participate in the exchange of debentures for stock.
¶ 35. We first look at the relevant statutes. In 1993, the Code provided that "a transferor's duty to transfer a security under a contract of purchase is not fulfilled until he: (a) places a certificated security ... in the possession of the purchaser...." Miss.Code Ann. § 75-8-314(2) (Supp.1990) (repealed 1996 Miss. Laws ch. 468, § 72). The official comment explains that the section "provides that a transferor's duty is fulfilled by physical delivery of a certificated security." First Southwest and Lampton were involved in a potential contract of purchase. A "purchase" is a "taking by sale ... or any other voluntary transaction creating an interest in property." Miss.Code Ann. § 75-1-201(32) (Supp.1998). Therefore, we find that physical delivery of the debentures was required in order to convert them into stock pursuant to the subscription agreement.
¶ 36. The chancellor found that although physical delivery may be required, First Southwest waived any such requirement. The supreme court has adopted a legal dictionary definition of "waiver":
Waiver presupposes a full knowledge of a right existing, and an intentional surrender or relinquishment of that right. It contemplates something done designedly or knowingly, which modifies or changes existing rights, or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right. To establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived.
Ewing v. Adams, 573 So.2d 1364, 1369 (Miss. 1990) (quoting Ballantine's Law Dictionary 1356 (3rd ed.1969) (citations omitted)). The exhibits and testimony introduced by Lampton dealt primarily with First Southwest's efforts to assist Lampton in obtaining a bond so that the debenture certificates might be reissued. Ron Smith, Lampton's attorney, testified about his negotiations with First Southwest concerning reissue of the debentures. He also discussed the problems both he and Lampton had in procuring a sufficient indemnity bond. First Southwest introduced the letters between the parties during the second half of 1993. Its chairman contacted a company in November 1993 willing to write such a bond, indicating that the corporation was continuing to insist upon the bond at the same time as it was extending the time for Lampton to acquire one. However, as previously discussed, Lampton was unable to qualify for the bond. In its answer to the complaint, First Southwest on December 1, 1993, again said that a bond was required.
¶ 37. At no point did First Southwest advise Lampton that it would convert the debentures into stock without physical delivery nor without release of Hancock Bank's lien. What we discover in the record is that First Southwest assisted Lampton so that he might be able to tender unencumbered debenture certificates, during a time that Lampton did not possess his encumbered, missing debenture certificates. As the chancellor found. First Southwest cooperated with Lampton's efforts to "work out a way to reissue the debentures." Aiding Lampton in this manner evidences no "voluntary surrender of a right" on the part of First Southwest. It would have been pointless for First Southwest to aid Lampton in procuring reissued certificates if they were unnecessary to the exchange in the first place. The chancellor held that a letter from the corporation's chairman to Lampton in October gave no notice of rejection of Lampton's request to convert his debentures. That five-sentence letter merely transmitted the forms necessary for Lampton to acquire an indemnity bond. Once the bond was acquired, the letter *996 stated, "replacement certificates will be issued."
¶ 38. The chancellor based waiver on the proposition that First Southwest cannot "be aware of these alleged deficiencies in Lampton's position and work with him to resolve [them] and then suddenly take the position that Lampton's subscription agreement was never in compliance with the offering circular in the first place." To the contrary, working with Lampton so that he could comply with the offering is not the equivalent of saying that he need not comply. There was no testimony or evidence in any form that replacement debentures were merely First Southwest's preference, but failing that the exchange would still be permitted. The chancellor may have been seeking an explicit written statement of the importance of the replacement debentures, but we find that it was made plain that acquiring new debentures was always considered to be mandatory.
¶ 39. Lampton also suggests that by not sending the security agreement back to him once it was discovered that the debentures were missing was a waiver. It is unclear but unimportant whether the debentures initially had to be attached to the subscription agreement. At some stage, in order to effectuate an "exchange," they would have to be offered. They would also, according to the agreement, need to be unencumbered. There was always a deadline for completing the exchange, a deadline that the company extended but which underlay all the negotiations. Lampton was never in a position prior to the end of 1993 to provide any debentures, much less unencumbered ones.
¶ 40. First Southwest argues that waiver was not raised by Lampton in his pleadings, not litigated during trial, not defended by First Southwest, and not consented to as an additional issue. It first appears as an issue in the final decree. Since we find that there was no evidence to support waiver, we need not address possible procedural defects in the issue.
¶ 41. In conclusion, we hold that Lampton did not comply with the terms of First Southwest's offer to exchange debentures for stock by December 31, 1993. Nothing in First Southwest's insistence on a bond or its assistance to Lampton in acquiring one excused Lampton from meeting the deadline. Therefore no contract was ever formed to permit Lampton to participate in the exchange.
¶ 42. THE JUDGMENT OF THE PIKE COUNTY CHANCERY COURT IS REVERSED AND RENDERED. COSTS OF THIS APPEAL ARE ASSESSED AGAINST THE APPELLEE.
BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HERRING, HINKEBEIN AND KING, JJ., CONCUR.
PAYNE, J., NOT PARTICIPATING.
NOTES
[1] In separate litigation commenced on November 15, 1993, Hancock Bank brought suit in Harrison County Chancery Court against both Lampton and Smith. First Southwest was not a party. The bank sought either the money due under the settlement agreement or an order directing Smith to take the steps necessary to obtain reissue of the debentures, so that Hancock could sell the stock and/or debentures in order to satisfy Lampton's debt.
[2] A judgment in the separate Harrison County litigation, dated October 22, 1996, was introduced as part of the record in this suit. The $61,000 that Lampton had received as interest was not paid to Hancock Bank and Lampton still owed $66,000 to Hancock. Therefore the debentures and stock continued in 1996 to be burdened by the bank's lien.